Fernande **BODNER**, et al., on behalf of themselves and all others similarly situated, Plaintiffs,

v.

**BANQUE PARIBAS**, et al., Defendants.

Anne Marie Benisti, et al., on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Banque Paribas, et al., Defendants.

Nos. 97 CV 7433(SJ), 98 CV 7851(SJ).

United States District Court, E.D. New York.

Aug. 31, 2000.

Goodkind Labaton Rudoff & Sucharow LLP, New York City, by Kenneth F. McCallion, Thomas A. Dubbs, H. Rajan Sharma, Roy H. Carlin, PC, New York City, Harriet Tamen, New York City, Cohen Milstein Hausfield & Toll, PLLC, Washington, D.C., by Michael D. Hausfeld, Paul T. Gallagher, Lieff Cabraser Heimann & Bernstein, New York City, by Elizabeth Cabraser, Michael Ratner, Milberg Weiss Bershad Hynes & Lerach, LLP, New York City, by Melvyn Weiss, Joseph Opper, Milberg Weiss Bershad Hynes & Lerach, LLP, New York City, by Melvyn Weiss, Joseph Opper, Cohen & Malad, PC, Indianapolis, IN, by Irwin Lewin, Richard Shevitz, Law Offices of Curtis Trinko, LLP, New York City, Starr & Holman, LLP, New York City, by Thomas A. Holman, for plaintiffs.

Shearman & Sterling, New York City, by Frederick T. Davis, for defendants Banque Paribas, Credit Lyonnais, Societe Generale, Credit Agricole, Banque Indosuez a/k/a Credit Agricole Indosuez, Natexis f/k/a Banque Credit Francaise due Commerce Exterieur.

White & Case, LLP, New York City, by Owen C. Pell, for defendants Credit Commercial de France and Chase Manhattan Bank.

Cahill Gordon & Reindel, New York City, by Floyd Abrams, for Barclay's Bank and J.P. Morgan.

Chase Manhattan Legal Department, New York City, by Robert Stephenson, for defendant Chase Manhattan Bank.

*MEMORANDUM AND ORDER*

JOHNSON, District Judge.

Presently before the Court are defendants' motions to dismiss this action on various grounds including standing, international comity, Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, and other jurisdictional and substantive grounds. For the reasons stated below, defendants' motions to dismiss are denied in their entirety.

## BACKGROUND

The *Bodner*[1] and *Benisti* plaintiffs bring this action for damages, an accounting, and to recover cash, records, art, jewelry, bank deposits, instruments, securities, other business, personal, and real property, and other assets allegedly wrongfully taken and withheld from them and their families (hereafter, the "looted assets") by persons or entities including Defendant Banks during the German occupation in France, and by the Vichy government. Plaintiffs seek recovery of the looted assets, full disclosure, accounting, disgorgement, restitution, compensatory, and punitive damages for the unlawful seizure and retention of the assets and the unjust enrichment of defendants over the past 50 years.

Before this Court are two related class actions, *Bodner, et al. v. Banque Paribas,* *et al,* No. 97 Civ. 7433, and *Benisti, et al. v. Banque Paribas, et al.,* No. 98 Civ. 7851. The cases are substantially identical, except *Bodner* was filed on behalf of United States citizens and the *Benisti* plaintiffs are aliens who assert their claims under the Alien Tort Claims Act. Defendants' motions to dismiss apply to both cases and this Memorandum and Order shall resolve the pending issues in each case.

### The Parties

The putative plaintiff class consists of all persons who themselves or whose family members were the Jewish victims and survivors of the Nazi Holocaust in France, their heirs and beneficiaries, and whose assets were deposited in or processed by or converted by one or more of Defendant banks during or after the Holocaust and not returned to the present date. Compl. at ¶ 76–77. The *Bodner* plaintiffs are United States citizens, while the *Benisti* plaintiffs are aliens who bring claims under the Alien Tort Claims Act.

Defendants are banking institutions operating in France during World War II, and their predecessors or successors. Named defendants are alleged to control the overwhelming majority of the banking market in France, and also do substantial business worldwide. *Id.* at ¶ 79. Plaintiffs contend defendants have substantial rec-

---

1. Fernande Bodner is a U.S. citizen who lives in Brooklyn and was born in France on May 13, 1928. Her father, Chaim (Charles) Bodner was deported to the Drancy prison camp in 1944. Prior to that, he had been a furrier who worked out of his home. His apartment, which contained his furrier machinery and equipment, silver, china, paintings, and jewelry, was sealed by the Vichy government and their possessions were expropriated by the French authorities. The Bodners also had various bank accounts; Fernande Bodner specifically recalls her father telling her of an account in her name. When her father was deported, plaintiff was forced to wear a yellow star and was placed in a Vichy Home for French Jewish children. Upon arriving home one day, she saw the French authorities loading children into trucks. Bodner went underground, survived the war and emigrated to New York. Complaint at ¶ 1–5.

Bodner is the sole surviving heir of her father. However, she has been unable to access the bank accounts and other property that belonged to him. All of their business and personal assets were seized by Vichy authorities and then turned over to other parties. Their bank accounts were blocked by Defendant banks. The seizure of the Bodners' assets comports with the Vichy government's comprehensive undertaking to 'aryanize' the personal, real, and business property of Jews. *Id.*

Other named plaintiffs cite the blocking of their bank accounts as the chief reason their parents and family members could not finance their escape from the Nazi persecution, including letters from banks denying them their funds. As a result, named plaintiffs' families were deported to concentration camps where they later died.

ords and documents tracing the history, fate, and location of the looted assets. *Id.* at ¶ 79.

### Underlying Facts

Plaintiffs claim defendants aided and abetted and conspired with the Vichy and Nazi regimes to plunder private property of plaintiffs, that defendant banks actively participated and profited from the plunder, and that these actions deprived plaintiffs of their means to finance their escape. *Id.* at ¶ 116.

The gravamen of plaintiffs' case is that defendants' looting of Jewish assets, the derivative facilitation of the murder of Jewish civilians as part of the Nazi regime's genocide program, and antisemitic discrimination by seizing Jews' property constituted complicity and conspiracy with the Nazi and Vichy regimes and aided and abetted the violations of international law during the war. *Id.* at ¶ 116. After the war, plaintiffs claim the defendants unjustly refused to return the looted assets, enriched themselves with the derivative profits, and concealed information, value, and derivative profits of the looted assets from the plaintiffs. *Id.* at ¶ 117.

According to plaintiffs, actions in furtherance of these goals included a French Banking Association Circular outlining the plan to seize plaintiffs' assets; blocking and confiscating plaintiffs' accounts and safety deposit boxes in advance of any official compulsion to do so; asking depositors to fill out detailed geneological questionnaires before allowing them, if non-Jewish, to withdraw or transfer funds; acting in concert with the Nazis and Vichy to profit from the expropriated assets; misrepresenting to plaintiffs and the general public their role during the Vichy government and their continued retention of assets; and failing to provide an accounting and restitution to plaintiffs. *Id.* at ¶ 118.

### The Complaint

In the complaint, plaintiffs make several claims and seek to recover both monetary and declaratory relief. In Count One of the complaint, plaintiffs claim defendants' actions violated international laws including, but not limited to: the Nuremberg Charter Article 6(b), the Nuremberg Principles, the Hague Convention of 1907 Article 46, the Genocide Convention Article III(e), the United Nations Charter, and the Universal Declaration of Human Rights. *Id.* at ¶ 119.

In Count Two of the complaint, plaintiffs allege a violation of the Convention of Establishment, a 1959 treaty between the United States and France, which dictates the property of nationals of either contracting party could not be expropriated without a public purpose and just compensation. *Id.* at ¶ 123. Plaintiffs allege the treaty is applicable because the majority of the plaintiff class emigrated and became citizens of the United States after World War II. *Id.* at ¶ 123.

Count Three claims that defendants wrongfully assumed, retained, and exercised rights of ownership over the looted assets and that this constitutes conversion. Count Four alleges unjust enrichment in that defendants' refusal and failure to return the looted assets improperly deprived plaintiffs of their property and afforded defendants a substantial windfall from over fifty years of interest and investment returns. In Count Five, plaintiffs claim defendants had a special duty, in addition to their fiduciary responsibilities, to hold and maintain plaintiffs' assets with the utmost care for the account holders and their families and successors in interest. Defendants allegedly breached their fiduciary and special duties to plaintiffs by seizing the assets and by failing to conduct a full accounting after the war. *Id.* at ¶ 135.

In Count Six, plaintiffs contend that Defendant banks were obligated to retain and hold accounts, assets, and property on their behalf in trust and with the highest degree of care. *Id.* at ¶ 138. From the moment the blocking laws became effective, plaintiffs claim the banks accepted a *de facto* legal role as trustees of the se-

questered accounts and safe deposit assets. *Id.* at ¶ 139. Despite this, defendants failed to provide adequate information as to the status of plaintiffs' assets and property. Nor have they, according to plaintiffs, offered restitution or compensation for their retention of the assets or their non-disclosure of records pertaining to plaintiffs. *Id.* at ¶ 142. Plaintiffs claim Defendant banks failed to return blocked assets pursuant to 1944 laws requiring them to do so, and an accounting is necessary in order to best determine the rights of the plaintiffs. Since they never relinquished their interests to these accounts, plaintiffs allege they are entitled to demand a full accounting. *Id.* at ¶ 142.

### The Matteoli Commission[2]

The French government formed an independent commission comprised of historians, diplomats, lawyers, and magistrates to "study the conditions in which goods may have been illicitly acquired ... and to publish proposals" regarding redress of Holocaust-era atrocities in France. Ptf.Mem. at 6 (quoting 1st Matteoli Comm'n Rep. at 4). The self-termed "study mission" submitted its first progress report submitted to the French Prime Minister on December 31, 1997. In that document, the Commission discussed its mandate, its inability to provide relief or redress to injured parties under its charter, and its largely information-gathering role. 1st Report at 3–4, 116. The second progress report was released in February of 1999. The Commission published its final report and an English summary on April 17, 2000. Since the completion of its final report, and having achieved its mandate, the Commission has been dissolved.

While defendants claim the work of the commissions will, in large part, obviate the issue of redress, plaintiffs question the degree to which the magnitude of restitution appropriate has been acknowledged. Specifically, there appears to be an unaccounted, missing five billion francs upon review and some numbers contained in the reports appear to raise questions. According to plaintiffs, the Commission estimates that the amount of assets blocked initially is more than three times the amount of assets distributed in restitution, which may account for the missing five billion francs.

Defendant banks are claiming full compliance and maximum cooperation with the efforts of the commission; defendants claim that full restitution will eventually be achieved for the plaintiff class through the efforts of this commission. However, the parties disagree about the role of the commission. Plaintiffs note the Commission was not designed nor intended to deal with individual claims, but to "treat general characteristics of spoilation and restitution ... it is not compatible with responding to individual requests, not matter how legitimate the concerns which give rise to them." Ptf.Mem. at 6 (quoting 1st Matteoli Comm'n Rep. at 4). Defendants counter, claiming the Matteoli Commission is a part of a comprehensive endeavor on the part of the French government to flush out the scope of liability, provide a full accounting, and to make restitution.

### The Saint Geours Supervisory Committee

The Matteoli Commission suggested the creation of this second commission to act as a supervisory committee for the bank-

---

**2.** Throughout, the Court refers to the reports of the Matteoli Commission only to comment on the mandate of the commissions and other facts of general notoriety alleged and detailed in the pleadings, including commonly used propositions and baseline figures for the scope and nature of the aryanisation policies followed during the Holocaust. It is worthwhile to note here, however, that the Court does not take these reports affirmative evidence probative of any of the parties' claims,

and that the Court does not use any *findings* of the Matteoli Commission as basis for deciding this motion, or for any other reason in this opinion. As such, the reports of the Matteoli Commission are not outside exhibits which compel conversion of the 12(b)(6) motion contained herein to a motion for summary judgment. Such conversion is improper in any case at this early, pre-discovery stage of this litigation.

ing and financial sectors. The members were primarily representatives of the French banking community. The commission was charged with examining the treatment of the sequestrated assets to ascertain whether the banking and financial sectors were still in possession of the assets. That committee instructed banks to investigate their own involvement in the spoilation and restitution process, extend the research as necessary, coordinate public and private research, and to compare archives. It is a research committee which gathers information, but does not provide specific, individual redress.

### The Drai Commission

The Matteoli Commission created a third commission charged with examining individual applications and working to compensate the victims of spoilation resulting from Holocaust-era anti-Semitic legislation. Final Report at 15. The Drai Commission was created as a reconciliation body to attempt to reach an agreement between the parties. *Id.* If settlement proved impracticable, the commission, established September 10, 1999 by prime ministerial decree, was to investigate, and make recommendations as to how to achieve individual restitution, likely through the framework of a government-sponsored institution. *Id.*

### Defendants' Motions to Dismiss

In their motion, defendants claim: (1) plaintiffs lack standing to pursue these claims; (2) there is no federal question subject matter jurisdiction over either action, and that there is no diversity jurisdiction over the *Bodner* case; (3) the Court should defer to proceedings in France and decline jurisdiction under principles of international comity, the Act of State Doctrine, and the doctrine of *forum non conveniens*; (4) plaintiffs have failed to state a claim, under French or New York law, for the violation of any international law or breach of any treaty and their claims are

3. Note that this is precisely the purpose of class action: many plaintiffs were *children*

time-barred; (5) plaintiffs have failed to join indispensable parties.

### PROCEDURAL HISTORY

The *Bodner* case was commenced on December 17, 1997. Plaintiffs filed the first amended complaint on March 20, 1998. The Second Amended Complaint was filed in this case on March 1, 1999. The related action, *Benisti*, was filed on December 23, 1998. The parties filed this motion on November 1, 1999. This Court heard oral argument on the motion on March 15, 2000.

### DISCUSSION

### I. Standing

Defendants claim that plaintiffs lack standing to maintain this action because they have not pled sufficient facts to demonstrate the injuries alleged are "fairly traceable" to particular defendants' conduct and because plaintiffs' state claims regarding property interests of their deceased families. Plaintiffs dispute the merit of each of these grounds, claiming they have standing to sue each defendant, even those with whom they had no specific transactions, as the Second Amended Complaint alleges facts sufficient to show a conspiracy which included even the banks which did not have specific transactions with the plaintiffs. Plaintiffs also claim the named plaintiffs have standing to sue in their own capacities, for restitution of assets that have vested in them.

### A. Causation

Defendants claim of lack of causation arises because some plaintiffs do not name a specific bank as the source of their loss;[3] because two of the banks, Credit Agricole Indosuez and Natexis, are never explicitly named as wrongdoers by any plaintiff; and because none of the plaintiffs claim to be

when the assets were stolen.

the legal representatives of their relatives. Defendants contend liability does not actually lie with the defendants listed in the complaint because the two largest holders of deposits before and during the war were nationalized institutions, the Caisse d'Epargne (a national savings institution) and the Post Office. Defendants also claim that plaintiffs failed to name in their complaint hundreds of banks and financial institutions that did business during the war and which are still in existence today. Plaintiffs counter, noting that defendant banks are among the largest French commercial institutions that participated in the looting practices and that together they controlled 60–80% of the French banking market and are among the largest French commercial institutions doing business in the United States.

■■■ However, plaintiffs accurately state that they need not show more than general factual allegations laying out a good faith basis for how one or more of the defendants injured plaintiffs. Nor must each plaintiff allege facts against all defendants, nor each defendant's relationship with a plaintiff be explicitly identified. Under conspiracy law, where a plaintiff alleges injury as a result of a conspiracy where there were non-dealing actors, plaintiff has standing to sue the non-dealing partner-defendants. *Brown v. Cameron–Brown Co.,* 652 F.2d 375, 378 (4th Cir. 1981). *Presidential Life Ins. Co. v. Milken,* 946 F.Supp. 267, 280 (S.D.N.Y.1996). Defendants may be responsible for a co-conspirator's conduct in furtherance of the alleged conspiracy even if they have not dealt directly with plaintiffs. *See Continental Cas. Co. v. Diversified Indus.,* 884 F.Supp. 937, 961 (E.D.Pa.1995). The 'silent partner' banks may be liable for their acts in furtherance of the conspiracy. Courts have found that plaintiffs have standing to sue in situations such as this. *See e.g., In Re NASDAQ Market–Makers Antitrust Litigation,* 169 F.R.D. 493, 508 (S.D.N.Y.1996) (reasoning the injury to one plaintiff by a particular defendant as a result of the conspiracy confers standing to represent a class of plaintiffs injured by any of defendants' co-conspirators, even where only twenty-three of thirty-three defendants were alleged to have traded on behalf of plaintiffs); *duPont Glore Forgan Inc. v. American Tel. & Tel.,* 69 F.R.D. 481, 486 (S.D.N.Y.1975) (finding standing exists where plaintiffs dealt with only two of twenty-three defendant companies).

■■■ The Second Circuit has dismissed complaints which plead conspiracy in vague or conclusory terms and which do not allege specific instances of misconduct in furtherance of the conspiracy. *See Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977). Likewise, this Court has ruled that the presentation of conclusory statements regarding the existence of a conspiracy, without reference to specific facts which might support a conspiracy, do not adequately support a claim of conspiracy in the pleadings. *Harrison v. New York City Dep't of Corrections,* No. 96 Civ. 1465(SJ), 1997 WL 218211, at *2 (E.D.N.Y. Apr. 21, 1997). Plaintiffs in the instant case, however, have described in detail the conspiracy alleged to have existed during and after the Holocaust to deprive Jews of their assets, its continuation after the end of World War II, and the public laws and social structures enacted to enable the alleged conspiracy. The Second Amended Complaint alleges concerted action in violation of international law, including a tremendous conspiracy, wherein the entire power structure of the French banking system acted to deprive Jews of their property deposited in these banks for safekeeping. Plaintiffs claim each of the named defendants, or its predecessor or successor, participated in the purported misconduct and identify generally defendants' role in the alleged conspiracy.

In the complaint, and in their opposition papers, plaintiffs have alleged sufficient facts to support the inference of an overall conspiracy to deprive French Jews of their assets during the Holocaust, in which French banking institutions were involved.

Indeed, defendants admit that "[d]uring the occupation of France that commenced in June 1940 and the Vichy Regime that governed part of France thereafter, the bank accounts, real estate, and other assets of many Jews living in France were seized by the German occupiers and by operation of Vichy laws and decrees." Def.Mem. at 2. The nature, scope, and magnitude of the alleged conspiracy is evident to the Court and plaintiffs have thus satisfied their pleading requirements. Although defendants have anecdotally attacked the standing of some of the plaintiffs, they have not vitiated plaintiffs' standing and, in fact, only further establish the importance of thorough discovery in this case. The court concludes that a conspiracy by the defendants has been pleaded properly and that the individual named plaintiffs have standing to sue even those banks with which named plaintiffs did not allege specific transactions, including Credit Agricole Indosuez and Natexis.[4]

### B. Plaintiffs' Capacity to Sue on Their Own Behalf

■ Defendants also contend this action must be dismissed for there is no legal basis for plaintiffs to bring claims which have allegedly not accrued to plaintiffs. Defendants claim plaintiffs lack standing to bring several claims in their individual capacities and that they are precluded from bringing the claims in a representative capacity by New York's Survival Act, N.Y.E.P.T.L. § 11–3.2, which mandates that the right of action of a decedent may only be brought by a court-sanctioned personal representative of that decedent, since plaintiffs have not claimed standing as the personal representative of their relatives' estates. To resolve this, defendants claim, eliminates diversity jurisdiction as there would be French claimants on both sides of the action.

However, plaintiffs argue they are statutory distributees of the decedents' estates and the property interests prosecuted in this case vested in plaintiffs upon the deaths of their intestate (or otherwise) ancestors, interests which they may pursue in their own names. Further, plaintiffs contend New York State Estates Law can only apply to the plaintiffs whose parents died domiciled in New York.

The Court finds that plaintiffs' position has merit. Many of the relatives of the named plaintiffs died in concentration camps in Europe during the Holocaust. They had resided in France before their detention in concentration camps and, under French law, title to and right of possession of all assets of the intestate decedent vest immediately in the decedent's legatees. *See Roques v. Grosjean*, 66 N.Y.S.2d 348, 349 (N.Y.Sup.1946); McCallion Decl., Ex. H, *The French Civil Code* (1995) at 430. Upon death, "the decedent's property passes immediately to those entitled ... without passing through the intermediary of an estate; courts are involved only in the event of adversary litigation...." *Id.* at 430. Thus, plaintiffs whose parents died in Nazi concentration camps may properly bring this action in their own names.

■ As for those plaintiffs whose parents died domiciled in New York State, New York law provides them vested ownership interests in their deceased relatives' personal property. *See e.g., United States v. Comparato*, 850 F.Supp. 153, 157 (E.D.N.Y.1993) ("A statutory distributee acquires 'a vested interest in the decedent's net estate' on the date of the person's death, not on the date of distribution or determination of the estate's proceeds.)" (citing *In re Estate of Smith*, 114 Misc.2d 346, 451 N.Y.S.2d 546, 548–49

---

4. While the mere allegation that defendants participated in the conspiracy does not create standing, the Court will not overlook the fact that plaintiffs sue for redress from a policy which legally required the spoilation of Jew-

ish assets, and which some banking institutions, including defendant banks, allegedly adopted before they were legally required to do so.

(Surr.Ct.Queens County 1982); *In re Wilson's Estate*, 298 N.Y. 398, 83 N.E.2d 852, 854 (1949)) (legacy vests immediately upon death of testatrix); *Kingsland v. Murray*, 133 N.Y. 170, 30 N.E. 845, 846 (1892); *Turchiano v. Woods*, 85 Misc.2d 991, 381 N.Y.S.2d 775, 777 (Sup.Ct.Queens County 1976); *In re Fry's Estate*, 28 Misc.2d 949, 218 N.Y.S.2d 755, 757 (Surr.Ct.Suffolk County 1961) (all real property not disposed of by will vests immediately in the statutory distributees). Thus, this Court finds that plaintiffs have standing to pursue these claims. Defendants have failed to establish lack of standing as a basis for dismissal of this action.

## II. Subject Matter Jurisdiction

Defendants contend this Court lacks subject matter jurisdiction over these actions. Claiming plaintiffs have not properly pled a federal question, defendants challenge this Court's jurisdiction over the *Bodner* action. Arguing plaintiffs have failed to allege facts sufficient to demonstrate a violation of international law, defendants contest this Court's ability to assert jurisdiction over the *Benisti* claims under the Alien Tort Claims Act (ATCA)

### A. *The Bodner Complaint* —Federal Question Jurisdiction & Supplemental Jurisdiction

Defendants move to dismiss, claiming the *Bodner* plaintiffs lack a private right of action under the international laws and treaties pled in the complaint and that plaintiffs, therefore, have failed to establish federal question jurisdiction. Defendants maintain that plaintiffs' remaining claims arise under state law and are be-

5.  "It is only where the nations of the world have demonstrated that the wrong is of mutual, and not merely several, concern, by means of express international accords, that a wrong generally recognized becomes an international law violation." *Filartiga*, 630 F.2d at 888.

6.  As the Court retains jurisdiction over the *Bodner* action pursuant to its power under 28 U.S.C. § 1331, federal question jurisdiction, the Court will not address the question of

yond the scope of this Court's jurisdiction. Plaintiffs, on the other hand, claim federal question jurisdiction has been adequately established, noting that international law is enforceable in the United States as federal common law.

■ Federal courts have jurisdiction over claims involving violations of customary international law. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 415, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (holding cases arising under international law fall within Article III judicial power). The Second Circuit has noted that it is a "settled proposition that federal common law incorporates customary international law." *Kadic v. Karadzic*, 70 F.3d 232, 246 (2d. Cir.1995). This Circuit also has recognized that international law likely falls under 28 U.S.C. § 1331 federal question jurisdiction. *Filartiga*, 630 F.2d at 887.

■ In this case, plaintiffs have clearly plead events which, if proven, are clear violations of international law. The alleged looting, conversion, and continued withholding of assets which rightfully belonged to plaintiffs clearly violate the Nuremberg Principles and longstanding principles of customary international law.[5]

■ Thus, the Court finds that federal question jurisdiction exists over the *Bodner* complaint. Defendants' motion to dismiss for lack of subject matter jurisdiction is hereby denied.[6] To the extent that this Court lacks jurisdiction over the state law claims alleged in the *Bodner* complaint, the Court invokes its discretion under 28 U.S.C. § 1367 to exercise supplemental jurisdiction to the full extent that the statute allows.[7]

whether diversity jurisdiction exists for the *Bodner* plaintiffs.

7.  Under 28 U.S.C. § 1367(a), a district court may assert supplemental jurisdiction over non-federal claims that are so related to the federal claims within its original jurisdiction that they form part of the same case or controversy under Article III of the States Constitution. State and federal claims form 'one

**B.** *The Benisti Complaint—Alien Tort Claims Act Jurisdiction,*

Defendants insist that plaintiffs fail to allege facts sufficient to violate an international law or treaty, a prerequisite to a claim under the Alien Tort Claims Act (ATCA), 28 U.S.C. § 1350.[8] The district court has subject matter jurisdiction over a claim asserted pursuant to the ATCA where: (1) an alien sues; (2) for a tort; (3) which was committed in violation of the law of nations. *Filartiga,* 630 F.2d at 881. The Court should look to construe the law of nations as it has evolved over time, applying contemporary norms of international law to the issues at bar. *Filartiga,* 630 F.2d at 881.

The putative class of *Benisti* plaintiffs is composed completely of aliens suing for torts in violation of international law, including allegedly aiding and abetting the Vichy and Nazi regimes to plunder plaintiffs' private property, depriving members of the Jewish community in France the means to finance their escape, facilitating Nazi genocide, and other claims. *Benisti* Cmpt. at ¶ 104. Such deeds were allegedly achieved by methods including blocking and confiscating the deposit accounts and the safety deposit boxes of the members of the putative class in advance of any official compulsion to do so, requiring depositors to fill out detailed, anti-semitic, geneological questionnaires, and distributing a circular of the French Banking Association detailing a common plan to seize Jewish assets. *Benisti* Cmpt. at ¶ 106. Plaintiffs refer to United Nations resolutions and the work of the Nuremberg tribunals as further evidence of the content of custom-

ary international law and the Court finds that such analogies have merit.

If plaintiffs are able to substantiate these claims with evidence after discovery, plaintiffs clearly will have demonstrated violations of contemporary international law and ample basis for federal subject matter jurisdiction pursuant to the ATCA. Taking these factual allegations as true for the purposes of this motion, plaintiffs have established international law violations sufficient to confer jurisdiction on this Court. Defendants' motion to dismiss the *Benisti* complaint for lack of subject matter jurisdiction is denied.

## III. International Comity and The Act of State Doctrine

Defendants have also claimed the Court should decline to exercise jurisdiction in this case based on principles of international comity and the Act of State doctrine. As stated below, the Court finds that the doctrine of international comity does not prescribe a deferral of jurisdiction to political proceedings in France, nor does the Act of State doctrine bar this Court's continued jurisdiction over these claims.

Defendants support their argument in favor of dismissal by noting that all the incidents occurred in France, that much of the applicable law in the case will be French law, and that several post-Liberation events (including the nationalization of all banks in 1946 and the postwar restitutionary measures taken by the French government) were the acts of a foreign sovereign. Furthermore, defendants claim that to retain jurisdiction is to stand in

---

case or controversy' when they "derive from a common nucleus of operative facts" or "when both claims would normally be expected to be tried in a single judicial proceeding." *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Generally, when either condition is satisfied, the court's exercise of supplemental jurisdiction, not automatic, would be a favored and normal course of action. *See Promisel v. First American Artificial Flowers, Inc.,* 943 F.2d 251, 254 (2d Cir.1991), *cert.*

*denied,* 502 U.S. 1060, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992). It is patently obvious that both conditions, as well as considerations of judicial economy, favor the assertion of supplemental jurisdiction here.

8. The Alien Tort Claims Act reads: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."

judgment of a foreign sovereign, which is expressly prohibited by the Act of State. The defendants argue the Court should defer to the French proceedings already in progress. However, plaintiffs note that there are no French judicial proceedings in progress and claim there are no remedies for the class members under French law. Where there is no clear and formal policy of redress, plaintiffs argue, there can be no violation of a law as-yet-uncreated.

### A. International Comity

■ The doctrine of international comity neither impels nor obliges the United States district court to decline jurisdiction in a particular case. *Cunard S.S. v. Salen Reefer Serv. AB*, 773 F.2d 452, 457 (2d Cir.1985). Instead, the doctrine is premised upon a respect for the acts of another nation balanced by a recognition of international duty and convenience, and consideration for the rights of a nation's own citizens and others under the protection of its laws.[9] *Laker Airways Ltd. v. Sabena Belgian World Airlines*, 731 F.2d 909, 956 (D.C.Cir.1984). Courts have consistently noted that where defendants fail to point to any specific legislative or judicial statement of policy of a foreign state or court, principles of international comity do not

apply. *Majorica, S.A. v. Majorica Int'l, Ltd.*, 687 F.Supp. 92, 96–7 (S.D.N.Y.1988).

■ In *Societe Nationale Industrielle Aerospatiale v. United States Dist. Court for Southern Dist. Of Iowa*, 482 U.S. 522, 555, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987), the Supreme Court noted that no comity conflict is triggered unless there is a true conflict between U.S. and foreign law.[10] In this Circuit, the threshold inquiry in determining whether principles of international comity merit dismissal is "the existence of a true conflict between American law and that of a foreign jurisdiction." *In re Maxwell Communication Corp. v. Societe Generale*, 93 F.3d 1036, 1049–50 (2d Cir.1996) (finding comity analysis relevant only where there is a true conflict of law).

■ The Matteoli Commission, and other executive-driven efforts at redress, with which defendants would supplant this lawsuit do not compel dismissal in that they do not provide a conflicting judicial, legislative or executive act to which this Court could reasonably defer. Plaintiffs note that no court has ever deferred to an informal, historic commission. Ptf.Mem. at 42. At this point, with the activities of the Matteoli Commission concluded, its final report published, and the committee itself dissolved, there appears to be little

9. Such concerns have resulted in the dismissal of Holocaust-era claims in two recent cases decided in New Jersey. The Court also notes here that the instant case is qualitatively different from the Holocaust-era cases recently dismissed, in part based on principles of international comity, in the District of New Jersey. *See Iwanowa v. Ford Motor Co.*, 67 F.Supp.2d 424 (D.N.J.1999); *Burger–Fischer v. DeGussa AG*, 65 F.Supp.2d 248 (D.N.J. 1999). First, as the court noted in *Degussa*, 65 F.Supp.2d at 281, n. 3, slave labor claims are factually and legally distinct from claims against defendant banks and different legal principles will apply to their adjudication.

Also, unlike the situation in *Iwanowa*, international comity considerations do not block plaintiffs from going forward; traditional judicial deference to a signatory nation's interpretation of a treaty and judicial non-interference with a foreign sovereign's pronouncement of its law, the principles

which merited dismissal in *Iwanowa*, are not issues in this case. Since Germany had explicitly taken the position that foreign citizens cannot assert direct claims for wartime labor against private companies, that court was bound to act with "respect for the acts of our fellow sovereign nations" and their pronouncements of their law. Absent any specific legislative or judicial statement of policy of a foreign state or court, as is the case here, international comity is not a relevant inquiry. Finally, these cases were determined to raise non-justiciable political questions, an issue not even raised by the defendants here and irrelevant to these facts in any event.

10. Even where there is a true conflict between domestic and foreign law, U.S. courts are not required by principles of international comity to defer to the foreign jurisdiction. *See Societe Nationale*, 482 U.S. at 543–44, 107 S.Ct. 2542.

to which this Court could potentially defer, other than a set of recommendations. There is no pending litigation in France, nor is the Court aware of any current law or policy of the French government which could either supplant or fully redress plaintiffs' claims. While it remains unclear to this Court exactly what measures the French government will take as a result of the investigative findings of the Matteoli, Drai and Saint–Geours Commissions, it is quite apparent that these commissions were never charged with providing comprehensive remedies to an aggrieved class.

Nor does the Court find credible the proposition that discovery in this action could somehow impede the work of the commissions or other political means of redress or vice versa. To the contrary, information-gathering efforts of the French government or of the American discovery process can only be mutually beneficial—cooperation in such efforts accrues to the benefit of the parties here and to the public as a whole.

Thus, since there is no pending litigation in France which will specifically address plaintiffs' claims or to which this Court could defer, there is no international comity issue in this case. There is no conflict that goes to the heart of the instant case; there is no possibility of an outcome that would violate (or implicate) French law. Furthermore, there are no laws or policies in France which indicate this Court should not assert jurisdiction here, nor is there an analogous possibility of class-based relief under French law.

## B. Act of State Doctrine

█ Defendants also argue this Court must dismiss this case pursuant to the Act of State doctrine, which essentially provides that U.S. courts will not sit in judg-

ment of acts of a foreign state within its own territory. The doctrine's foundation is separation of powers framework; judicial engagement in matters affecting foreign policy may ultimately hinder American interests. *See generally Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964).

In this case, it does not appear that this Court is being asked to pass judgment on the acts of a foreign state. To the contrary, even if this case did involve censure of a foreign sovereign, the sovereign involved is the Vichy Government, the official acts of which were rejected and revoked by the French government at the end of World War II. In *Sabbatino*, the Court explicitly recognized that the Act of State doctrine precluded review of acts of a foreign sovereign government, "extant and recognized by this country at the time of suit. . . ." *Id.* at 428, 84 S.Ct. 923. The wholesale rejection of the Vichy government at the close of World War II render the Act of State doctrine wholly inapplicable to this case.[11]

Nor is this the type of case envisioned by the Act of State doctrine. The Court in *Sabbatino* explicitly recognized that "the greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it, since the courts can then focus on the application of an agreed principle to circumstances of fact. . . ." *Id.* at 428, 84 S.Ct. 923. The Court acknowledges the widely-recognized principle of international law, at that time, proscribing the deprivation of property based on race. Trans. at 31.

At this time, the Court finds that the Act of State Doctrine is not implicated in this case. This is a lawsuit between pri-

---

**11.** Furthermore, plaintiffs correctly state that even if the Act of State doctrine did apply to plaintiffs' claims, the treaty exception to the doctrine would kick in to preclude dismissal. This exception holds the Act of State doctrine inapplicable where there is a treaty or other unambiguous agreement which provides controlling legal authority. In this case, the activity alleged by plaintiffs is clearly prohibited by international law, including the Hague Convention of 1907.

vate litigants for specific historical injury. Named defendants allegedly acted, in part, in advance of official compulsion under the law. Continued prosecution of this case neither violates France's sovereign interests, nor does it interfere with laws or policies of the French government. Plaintiffs here do not challenge current French law, but private defendant banks' failure to return the looted assets as mandated by postwar French law.

## IV. Forum Non Conveniens

Defendants also argue that this Court should dismiss on grounds of *forum non conveniens*. They hope to defeat the presumption in favor of plaintiffs' choice of forum by emphasizing that the relevant documents and witnesses, other than the named plaintiffs, are located in France. Further, defendants argue discovery is greatly complicated by the fact that many key documents are in the hands of the French government rather than the hands of the banks themselves, due to the investigative commissions the government established.

Defendants also claim that many of the assets held by the putative class members have escheated to the state upon expiration of the thirty-year statute of limitations. Plaintiffs strongly question the good faith basis for this argument; billions of francs have disappeared without any evidence of a massive transfer from banks to third parties, or to the French government under the doctrine of escheat, at any time after 1945. Defendants contend the Court will be frustrated in the eventual resolution of this case, since the French government may not be sued or compelled to participate in discovery. Finally, defendants note they are fully cooperating with the ongoing political redress efforts in France.

In order to succeed in a motion to dismiss on grounds of forum non conveniens, the defendant has the burden of demonstrating that (1) an adequate alternative forum is available to the plaintiffs; and (2)

private and public interest favor trial in the foreign forum. *See Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). It is the defendant's burden to establish the action should be dismissed for forum non conveniens. *Maria Victoria Naviera, S.A. v. Cementos Del Valle, S.A.,* 759 F.2d 1027, 1031 (2d Cir. 1985).

Ordinarily, the presumption in favor of the plaintiffs' choice of jurisdiction will control the decision of where a case will be tried. *See R. Maganlal & Co. v. M.G. Chem. Co., Inc.,* 942 F.2d 164 (2d Cir. 1991). "[U]nless the balance is strongly in favor of the defendant, the plaintiff's forum choice should rarely be disturbed." *Gulf Oil Corp. v. Gilbert,* 91 L.Ed. 1055 330 U.S. 501, 508, 67 S.Ct. 839 (1946). Thus, the plaintiff's forum choice "will not be overcome unless the relevant private and public interest factors weigh heavily in favor of trial in the alternative forum." *R. Maganlal & Co.,* 942 F.2d at 167.

■ Furthermore, specific to the *Bodner* plaintiffs, this Court notes it is appropriate to defer to American plaintiffs' choice of their home jurisdiction. As plaintiffs are American citizens and the proposed alternative forum is a foreign jurisdiction, their choice of forum is entitled to significant deference by this Court. *Argonaut Partnership, L.P. v. Bankers Trustee Co.,* No. 96 Civ. 1970, 1997 WL 45521, *13, 1997 U.S.Dist. LEXIS 1092 at *46–47 (S.D.N.Y. Feb. 4, 1997). *Accord Piper,* 454 U.S. at 255–56, 102 S.Ct. 252; *Olympic Corp. v. Societe Generale,* 462 F.2d 376, 378 (2d Cir.1972). *Cf. Derensis v. Coopers & Lybrand Chartered Accountants,* 930 F.Supp. 1003, 1009 (D.N.J.1996) (American plaintiffs' choice of United States' forum entitled to deference even in class action). This Court should not dismiss a complaint brought by American plaintiffs in favor of a foreign jurisdiction on *forum non conveniens* grounds unless trial in the United States is demonstrably "unjust, vexatious, or oppressive." *Flynn*

*v. General Motors, Inc.,* 141 F.R.D. 5, 8 (E.D.N.Y.1992).

## A. Possibility of An Adequate Alternative Forum

To satisfy the adequacy requirement, this Court must find that (1) defendants are amenable to process in the alternative forum, and (2) the subject matter of the lawsuit is cognizable in the alternative forum so as to provide plaintiff appropriate redress. *Derensis,* 930 F.Supp. at 1006. Defendants motion fails on the second prong of this inquiry. Defendants have not established that plaintiffs' claims would be actionable under French law and that the plaintiffs could preserve their rights to a remedy in a foreign jurisdiction. Furthermore, defendants have not established that an equivalent class action mechanism exists under French law which could provide plaintiffs similar or appropriate redress. While the possibility that the substantive law may be more favorable to the plaintiffs in the current forum is not entitled to substantial weight in reviewing defendants' motion to dismiss, *see Piper,* 454 U.S. at 247, 102 S.Ct. 252, the fact that there is not a functional equivalent in France of class-based judicial review strengthens plaintiffs' claim that France is not an adequate alternative forum.

Similarly, the Matteoli Commission, while a critical political means of recognition and redress for the atrocities committed during the Holocaust, cannot serve as an adequate alternative forum for the plaintiffs in this case. While the work of the study mission will provide substantial evidence that is relevant to the issues in this case, the Commission was designed primarily as an information-gathering device. Its function was to assess the nature and extent of the spoilation of Jews in France during and after the Holocaust and to make recommendations to the government of France regarding restoration and compensation. *See* "Summary of the General Report," Summary of the Work by the Study Mission on the Spoilation of Jews on France, Final Report, April 17, 2000.

As defendants have not demonstrated that this Court's abdication of jurisdiction would not strip plaintiffs of class-based relief or of a cause of action, the Court finds that defendants have not established there is an adequate alternative forum available to plaintiffs in this case.

## B. Private and Public Interests in Trial in the Foreign Forum

Even if there were an adequate alternative forum, dismissal on the grounds of *forum non conveniens* remains inappropriate since private and public interest favor this Court's continuing jurisdiction. Most of the *Bodner* plaintiffs live within the jurisdiction and would have difficulty traveling to France to prosecute an action there or to testify on their own behalf, due to age and/or expense. Defendants, alternatively, are large banking institutions that maintain offices and transact business in the United States and specifically New York City. All parties are represented by United States counsel and plaintiffs represent that there would be financial difficulty in obtaining French legal representation to commence an action in France because contingent fee arrangements are unavailable there. Ptf.Mem. at 62. Also, use of deposition testimony for witnesses who cannot travel from France is typical in international cases.

The parties also dispute the ability to do document discovery if the action is prosecuted here. Defendants note the burden of producing and translating numerous documents, allegedly located solely in France. Plaintiffs claim substantial relevant primary documentation exists in historical archives, collections, and elsewhere outside of France, and frequently in English. The National Archives in Washington, D.C. is one such example. It also appears that the efforts of the Matteoli Commission and whatever actions taken by the French government as a result of the commissions' reports will serve to reveal

and catalogue the very discovery information at issue in this case. The commissions' findings will be directly relevant to plaintiffs' claims and defendants' responses. The defendants have not demonstrated that issues of convenience and expense necessarily merit trial elsewhere.

Furthermore, this Court is not unaware that the advances of modern technology and the development of a global economy with instant access to information worldwide severely undercut defendants' claim of *forum non conveniens. Cf. Argonaut,* 1997 WL 45521, at *15, 1997 U.S.Dist. LEXIS 1092 at *53. The costs involved to defendants in defending this action in New York are significantly mitigated by the time- and money-saving tools including e-mail, fax, scanners, digital photography, and global access to the internet.

It also appears that public interest suggest this Court should retain jurisdiction. "Public policy favors providing a forum in which United States citizens may seek to redress an alleged wrong." *American Home Assurance Co. v. Ins. Corp. of Ireland Ltd.,* 603 F.Supp. 636, 642 (S.D.N.Y. 1984). Even were French law to govern the action, this is not a basis, in itself, for dismissal on *forum non conveniens* grounds. *See Manu Int'l, S.A. v. Avon Products Inc.,* 641 F.2d 62, 67–68 (2d Cir. 1981); *R. Maganlal & Co.,* 942 F.2d at 169. New York State has also asserted a public interest in the subject matter of this litigation. *See e.g.,* N.Y.Comp.Codes R. & Regs., Title 9, § 5.50 (1996) (executive order establishing the New York State Governmental Commission on the Recovery of Holocaust Victims' Assets). Defendants have not established that public interests necessarily require this case to be litigated in France. The motion to dismiss on grounds of *forum non conveniens* is denied.

## V. Failure to State a Claim

### A. Rule 12(b)(6)

█ Defendants also move to dismiss this action for failure to state a claim, arguing they were merely complying with French law in seizing and retaining the assets of French Jews. Claiming compliance with the law is not actionable, defendants contend the complaint must be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Defendants would characterize the issues raised in this case as matters of public policy and refer to the Matteoli Commission and other task forces of the French government to address the issues raised by plaintiffs in the appropriate forum. To the degree that this is not the case, defendants allege these facts, as pled, do not demonstrate liability for any of the claims alleged by a defendant. Plaintiffs analogize defendants' claim to the "superior orders" defense used by many Nazis at Nuremberg, a defense rejected by the court there and prohibited under the Nuremberg Charter

The Federal Rules of Civil Procedure do not require a plaintiff to set out in detail the facts upon which a claim is based. All that is required is "a short plain statement of the claim" giving notice of the nature of the claim and the grounds upon which it rests. *Leatherman v. Tarrant County Narcotics Intelligence & Coord. Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); Fed.R.Civ.P. 8(a)(2).

In deciding a motion to dismiss, the Court must view the complaint in the light most favorable to plaintiffs. *Scheuer v. Rhodes,* 416 U.S. 232, 237, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Yoder v. Orthomolecular Nutrition Institute, Inc.,* 751 F.2d 555, 562 (2d Cir.1985). The Court must accept as true the factual allegations stated in the complaint, *Zinermon v. Burch,* 494 U.S. 113, 118, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), and draw all reasonable inferences in favor of the plaintiffs. *Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *Hertz Corp. v. City of New York,* 1 F.3d 121, 125 (2d Cir.1993). The complaint should be dismissed only "if it appears beyond a

reasonable doubt that the plaintiff can prove no set of facts in support of [his] claim which would entitle [him] to relief." *Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir.1994) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

The Court finds no merit whatsoever in defendants' argument that plaintiffs fail to state a claim actionable under the law. Taking the facts alleged by plaintiffs as true and drawing all reasonable inferences in favor of the plaintiffs, it appears that plaintiffs may well be able to prove violations of customary international law by presenting evidence to support their claims. The Nuremberg Tribunal determined that the commission of various acts during the Holocaust constituted international law violations. Included among these were those acts proscribed in the Hague Convention, including the plunder of private property which was prohibited by Article 46 of the Hague Convention. This Circuit has held that the confiscation of private property during the Holocaust was a violation of customary international law. *See State of Netherlands v. Federal Reserve Bank of New York*, 201 F.2d 455, 459 n. 4 (2d Cir.1953).

The Court finds that plaintiffs have stated a cognizable claim under international law for the confiscation and plunder of private property, for aiding and abetting genocide, and for conspiracy to plunder and transact in plundered property, all violations of international law. The facts, as pled, are sufficient to demonstrate potential liability of the defendants and, as such, will preclude dismissal on 12(b)(6) grounds.

### B. Statute of Limitations

Defendants maintain plaintiffs' claims are time-barred under the law since the spoliation of assets occurred in the 1940s.

Plaintiffs respond by claiming they have pled a continuing violation of international law which tolls the limitations period from running until the last offense is committed. According to the plaintiffs, time has not yet begun to accrue because defendants' alleged continued denial and failure to return the looted assets to plaintiffs, until this very day, means the statute has not begun to run.

In support of their claim, plaintiffs cite *Banco Nacional de Cuba*, 658 F.2d 875, where the Second Circuit found that "failure to pay compensation to the victim of an expropriation constitutes a violation of international law." 658 F.2d at 891. According to plaintiffs, defendants actions in failing to return plaintiffs' funds and in repeated denials of information to plaintiffs constitute a deliberate, continuous, and ongoing violation of international law for the past fifty years.

■ Federal courts have found the statute of limitations must accrue from the date of the last wrongful act where there is a continuing wrong. *Leonhard v. United States*, 633 F.2d 599, 613 (2d Cir.1980). Thus, under the continuing violation doctrine,[12] "the limitations period for a continuing offense does not begin until the offense is complete." *United States v. Rivera–Ventura*, 72 F.3d 277, 281 (2d Cir. 1995). The circumstances meriting application of the continuing violation exception must be compelling. *Blesedell v. Mobil Oil Co.*, 708 F.Supp. 1408, 1415 (S.D.N.Y. 1989).

■ The Court finds that plaintiffs' argument has merit and that the circumstances supporting application of the continuing violations doctrine are compelling. The nature of plaintiffs claim is such that the continued denial of their assets, as well as facts and information relating thereto, if proven, constitutes a continuing violation

---

12. The Court recognizes this doctrine is most frequently invoked in the employment discrimination context. However, the basis for such an exception to the ordinary rules of accrual that govern its application in the employment context also have some applicability here.

of international law reasonably within the exceptions to the ordinary laws of accrual. Furthermore, plaintiffs could hardly have been expected to bring these claims at the end of World War II, and claim they have been consistently thwarted in their attempts to recover funds and information from defendant banks. As pled, plaintiffs have stated a continuing violation of international law. As such, the statute of limitation has been tolled from running and plaintiffs' claims are not time-barred.

## VI. Equitable Tolling

Although this Court has decided that plaintiffs claims are not time-barred as a matter of law, there is also equitable basis for plaintiffs' ability to prosecute these claims. For the reasons stated below, the Court finds that equitable tolling of the statute of limitations is appropriate in this case.

Plaintiffs have argued that defendants should be equitably estopped from raising a statute of limitations defense since plaintiffs have been kept in ignorance of vital information necessary to pursue their claims without any fault or lack of due diligence on the part of the plaintiffs. Plaintiffs note that the limitation period may be equitably tolled during a defendant's fraudulent concealment of facts that would alert the plaintiff to the plaintiff's claim. *See Cerbone v. International Ladies' Garment Workers' Union,* 768 F.2d 45, 48 (2d Cir.1985).

The essence of the doctrine of equitable tolling of a statute of limitations "is that a statute of limitations does not run against a plaintiff who is unaware of his cause of action." *Long v. Abbott Mortgage Corp.,* 459 F.Supp. 108, 113 (D.Conn. 1978). The doctrine was developed in the fraud context and recognizes that the nature of such actions may make it impossible for a plaintiff to discover the facts underlying his cause of action until after the limitations period had expired. *See Holmberg v. Armbrecht,* 327 U.S. 392, 396–97, 66 S.Ct. 582, 90 L.Ed. 743 (1946).

"The doctrine has been applied in cases alleging causes of action other than fraud where the facts show that the defendant engaged in conduct, often itself fraudulent, that concealed from the plaintiff the existence of the cause of action." *Cerbone,* 768 F.2d at 48. *See also, Barrett v. United States,* 689 F.2d 324, 327–30 (2d Cir.1982); *Richards v. Mileski,* 662 F.2d 65 (D.C.Cir. 1981); *NLRB v. Don Burgess Construction Corp.,* 596 F.2d 378, 382–84 (9th Cir. 1979). In this circuit, the law allows for equitable tolling in circumstances where a defendant was "actively misled" or "prevented in some extraordinary way from exercising his rights." *Miller v. International Tel. & Tel. Corp.,* 755 F.2d 20, 24 (2d Cir.1985). One example of an 'extraordinary circumstance' meriting equitable tolling may be where plaintiffs can show that it would have been impossible for a reasonably prudent person to learn or discover critical facts underlying their claim.

In this case, plaintiffs allege a policy of systematic and historical denial and misrepresentation concerning the custody of the looted assets to plaintiffs and the public at large. Plaintiffs assert that defendants continue to deny their possession of the assets, the full scope of their role in the plunder of the assets of the French Jews, and even the existence of some of the accounts in question. Plaintiffs were misled as to whether defendant banks retained their assets or transferred them to third parties. Plaintiffs argue it would have been impossible for them to learn critical facts underlying their claim, including which of the banks was in possession of their assets, absent cooperation from the defendants. Finally, plaintiffs argue that the Holocaust, World War II, and the subsequent diaspora of the French Jewish community constitute extraordinary circumstances in and of themselves sufficient to invoke the doctrine of equitable tolling.

This Court, under its powers in equity, finds that application of the equitable tolling provisions is merited in this case. Should the alleged facts be supported by

evidence in discovery, there is certainly a strong undercurrent to the issues at bar suggesting the a deceptive and unscrupulous deprivation of both assets and of information substantiating plaintiffs' and their ancestors' rights to these assets. There is no reason that plaintiffs should be denied a forum for addressing their claims as a result of deceitful practices by the defendants which have kept them from knowing or proving the extent of these claims, if that proves to be the case. Defendants are not entitled to benefit from whatever ignorance they have perpetuated in the plaintiffs. Thus, plaintiffs are entitled to the benefit of equitable tolling.

## VII. Failure to Join Indispensable Parties

Defendants ask this Court to dismiss the complaint for failure to join indispensable parties pursuant to Rule 19 of the Federal Rules of Civil Procedure. Defendants claim that the French and German governments are indispensable parties to these claims. Plaintiffs object to this, claiming, among other things, the French and German governments are not necessary parties as defined by Rule 19(a) [13] in that they are, at most, joint tortfeasors and merely permissive parties under Rule 19; that the nature of French and German governmental obligations, possessions and liability are distinct from the wrongful conduct and misappropriated profit allegedly attributable to the named defendants. Furthermore, plaintiffs maintain that complete relief may be provided to the plaintiffs by defendant banks. Thus, plaintiffs claim that joinder of the French and German governments is not essential to effecting the relief requested.

### A Mandatory v. Permissive Parties

■ The Court finds that the facts in this case do not merit mandatory joinder. Although defendants claim that the French and German governments must be joined to his action "because they mandated and perpetrated the improper acts listed in the Second Amended Complaint," Def.Mem. at 10, it appears to this Court that the governments are, in the context of this case, joint tortfeasors at most. First, it is well established federal law that neither joint tortfeasors nor co-conspirators are indispensable parties. *See Continental Kraft Corp. v. Euro–Asia Devel. Group, Inc.,* 1997 WL 642350 (E.D.N.Y. Sept. 8, 1997); *Frink America, Inc. v. Champion Road Machinery Limited,* 961 F.Supp. 398, 405 (N.D.N.Y.1997) (citing *Georgia v. Pennsylvania R. Co.,* 324 U.S. 439, 463, 65 S.Ct. 716, 89 L.Ed. 1051 (1945)). The Rulemakers did not intend to make a necessary party of an ordinary tortfeasor who is potentially liable under the doctrine of joint and several liability. The Advisory Committee refers to "settled authorities holding that a tortfeasor with the usual 'joint and several' liability is merely a permissive party to an action against another with like liability." Fed.R.Civ.P. 19 advisory committee's note.

The Supreme Court has validated this in *Temple v. Synthes. Corp.,* 498 U.S. 5, 7, 111 S.Ct. 315, 112 L.Ed.2d 263 (1990), reversing the Court of Appeals for the Fifth Circuit for declining to recognize that the district court had abused its discretion in mandating joinder of potential joint tortfeasor defendants. *Temple,* 498 U.S. at 7, 111 S.Ct. 315. It has long been the rule that it is not necessary for all joint

---

13. Rule 19(a) provides in pertinent part:
A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so

situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

tortfeasors to be named as defendants in a single lawsuit. *Id.*

■ The facts before this Court, as presented in the complaint, allege injuries derived from acts specifically attributable to the named defendants. Some of the acts for which plaintiffs seek redress occurred in advance of any governmental compulsion. The complicity of the French and German governments in effecting and perpetuation the spoilation of Jewish assets does not mandate their joinder, it merely codifies their status as joint tortfeasors. This Court finds that there can be a fair and just adjudication without the governments as parties—they are, at most, permissive parties and Rule 19 does not compel their joinder to this action.

## B. Rule 19—Necessary Parties

■ The Court would add that even if Rule 19 analysis were appropriate here, defendants' motion still fails since the French and German governments are not necessary parties. Rule 19 sets forth a two-step test for determining whether the court must dismiss an action for failure to join an indispensable party. First, the court must determine whether an absent party qualifies as a 'necessary party' party under Rule 19(a). Only where the Court makes a finding that a party is necessary will it continue to the second inquiry, i.e., whether it is impossible to proceed in the party's absence, warranting dismissal. *See Temple,* 498 U.S. at 8, 111 S.Ct. 315; *Ryan v. Volpone Stamp Co.,* 2000 WL 1056317 at *15–*16 (S.D.N.Y. Aug.1, 2000). If a party does not qualify as necessary under Rule 19(a), then the court need not decide whether its absence warrants dismissal under Rule 19(b). However, where the court makes a threshold determination that a party is necessary under Rule 19(a), and joinder of the absent party is not feasible for jurisdictional or other reasons, the court must finally determine whether the party is 'indispensable.' If the court determines that a party is indispensable,

then the court must dismiss the action pursuant to Rule 19(b).

The burden of demonstrating that a party is necessary falls to defendants in this case. *King v. Pine Plains Central School District,* 918 F.Supp. 772 (S.D.N.Y.1996). Under Rule 19, a party is necessary where (1) complete relief may not be effected among those already parties in the person's absence; or (2) the absent party claims some interest relating to the subject matter of the action and their absence would either impair the absent party's ability to protect that interest or leave persons already parties subject to substantial risk of incurring multiple or inconsistent obligations as a result of the claimed interest. Fed.R.Civ.P. 19(a).

Defendants have elected to construe the complaint very broadly, and thus claim mandatory joinder. However, it is indisputable that the basic aim of the complaint was to secure relief from banks which, allegedly, had seized, converted, and failed to return plaintiffs' assets, either in time to finance their escapes or afterward until this very day. The named defendants are clearly capable of effecting this relief. Even if, as defendants allege, it is impossible to accurately determine appropriate damages without record and other documents held by the French and German governments, mandatory joinder is not warranted. *See Swain v. American Auto Accessories, Inc.,* No. 96 CV 7908, 1997 WL 137442, at *3 (S.D.N.Y. March 25, 1997) (holding party unnecessary to action despite need for accounting of third party's profits in determining damages.) The Court finds that the possibility of affording complete relief among the parties does not implicate the French and German governments. Thus, these governments are not necessary parties under Rule 19(a)(1).

Neither are the governments necessary parties under Rule 19(a)(2). Even if it were relevant, the German government has not claimed an interest in this matter; Rule 19(a)(2) analysis of German governmental interests is inappropriate. *See ConnTech*

*v. Univ. of Connecticut Edu. Props., Inc.,* 102 F.3d 677, 682 (2d. Cir.1996) (holding "[s]ubparts (i) and (ii) of Rule 19(a)(2) are contingent ... upon an initial requirement that the absent party claim a legally protected interest relating to the subject matter of the action.") (citing *Northrop*, 705 F.2d 1030, 1043 (9th Cir.1983)).

Although the French government arguably has claimed an interest in this matter, it is not at all clear to this Court that, in its absence from this litigation between private litigants, the French government's ability to protect its interests would be impaired or impeded or that any parties risk incurring double, multiple, or otherwise inconsistent obligations due to the interests of the French government. Should the plaintiffs prove their case, there is no French governmental interest that would be affected in rendering judgment. No final judgment sought be plaintiffs would require affirmative conduct or an altered position on the part of the French or German governments. *See* Ptf. Mem. at 103. No action by this Court will impair current or future political means of redress conducted. Plaintiffs note that although the doctrine of escheat mandates that monies in dormant accounts escheat to the state after thirty years, the massive transfers from french banks to the state that would be expected failed to materialize around the thirty-year anniversary of World War II. This Court finds little basis for the claim that the French government's ability to protect its interests is impaired or impeded absent joinder.

Defendants have highlighted the possibility of redress-oriented obligations set by the French government conflicting with any judgment by this Court. Def.Mem. at 18. At this time, the Court finds the possibility of such conflict remote and speculative at best. Speculative assertions over future political, extra-judicial prospects will not render the French government necessary to this action. *See Drankwater v. Miller,* 830 F.Supp. 188, 193 (S.D.N.Y.1993) (holding Rule 19(a)(2)(ii) will not implicate potential or future scenarios and finding such propositions "ex-

cessively speculative"). Even the speculative possibility if future litigation is not a sufficient basis for mandatory joinder. *See Manning v. Energy Conversion Devices, Inc.,* 13 F.3d 606, 609 (2d. Cir.1994) ("The speculative possibility of future litigation does not furnish a basis for compulsory joinder [under Rule 19]."); *Health–Chem Corp. v. Baker,* 915 F.2d 805, 810 (2d. Cir.1990) (same).

This Court finds the possibility that defendants will be subject to multiple or inconsistent obligations absent joinder highly speculative and remote in the extreme. There is no complicated web of liability set forth here; plaintiffs seek to recover from named defendants for their particular conduct during and after the Holocaust. This action involves disputes between private litigants for concrete injuries and does not implicate the French or German governments. Any French governmental interest in this action will not put named defendants at risk of incurring multiple or inconsistent obligations. At this time, the Court finds that plaintiffs' claims may be developed and, if meritorious, redressed without the participation of the governments of France and Germany. Defendants motion to dismiss for failure to join indispensable parties is denied.

## VIII. Class Certification.

Defendants also claim these actions cannot be maintained as a class actions. However, this issue is not yet ripe for review as plaintiffs have not yet asked this Court to certify a class.

### CONCLUSION

For the foregoing reasons, defendants' motions to dismiss are denied in their entirety. The parties will appear before the magistrate judge to immediately commence discovery and to continue settlement negotiations.

SO ORDERED.