**George ZIVKOVICH, et al., Plaintiffs,**

**v.**

**VATICAN BANK, et al., Defendants.**

**No. C 00–4319 MJJ.**

United States District Court,
N.D. California.

Aug. 23, 2002.

Peggy J. Reali, Donald F. Hildre, Dougherty & Hildre, San Diego, CA, Barry G. Reed, Keelyn M. Friesen, Zimmerman Reed, P.L.L.P., Minneapolis, MN, for Plaintiffs.

Jeffrey S. Lena, Berkeley, CA, Joanna D. Opperman, Hinshaw & Culbertson, San Francisco, CA, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

JENKINS, District Judge.

### I. INTRODUCTION

Before the Court are a motion to dismiss filed by Defendant Institute per le Opere di Religion ("IOR") and a motion to dismiss filed by Defendant Order of Friars Minor ("OFM").[1] IOR's motion requires the Court to determine whether it enjoys absolute immunity from suit as an organ or instrumentality of Vatican City because the conduct alleged is alleged to have occurred prior to 1952. In the alternative, the motion requires the Court to determine whether IOR is entitled to immunity under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1601, *et seq.* ("FSIA"). The motion also requires the Court to determine whether the doctrine of international comity prevails and prohibits suit. Finally, both IOR's motion and OMF's motion require the Court to determine whether the action should be dismissed because (1) the claims brought by Plaintiff George Zivkovich ("Plaintiff") are nonjusticiable political questions; and (2) Plaintiff lacks standing.

Having read and considered the papers,[2] and having heard the parties at oral argument, the Court declines to determine whether IOR is entitled to immunity, or whether comity precludes suit.[3] The Court, however, GRANTS IOR's motion and OFM's motion on grounds that the action raises nonjusticiable political ques-

---

1. The Court admonishes against the failure by the parties, specifically Plaintiff and IOR, to comply with the Civil Local Rules as to page limitations. Continued failure to comply may result in sanctions against the offending party.

2. In addition to their papers, Defendants file objections to Plaintiff's reliance on extrinsic evidence. Plaintiff also files objections, albeit informally and as a request to convert the motion into one for summary judgment. The Court will address each where appropriate below.

3. As indicated at the hearing, the Court is unable to determine the issues of whether the doctrine of either immunity or comity applies to preclude suit against IOR in the United States without considering material outside the pleading. Given the state of this record, and assuming Plaintiff brings a Rule 12(b)(6) motion, the Court finds it inappropriate to grant the motion because reasonably inferences must be construed in favor of Plaintiff. *See North Star Int'l v. Arizona Corp. Comm'n*, 720 F.2d 578, 580 (9th Cir.1983) (finding that in determining a motion to dismiss, the Court must assume all factual allegations to be true and must construe them in the light most favorable to the non-moving party). Likewise, the Court determines that it is unable to dismiss the action for lack of subject matter jurisdiction without permitting Plaintiff limited discovery where facts are disputed under Rule 12(b)(1). *See generally Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 713 (9th Cir.1992) (finding that since Plaintiff bears the burden of proving jurisdiction, and it is an abuse of discretion to dismiss for lack of subject matter jurisdiction without permitting Plaintiff limited discovery where facts are disputed). The Court need not reach the issues, however, in light of its decision with respect to the political question and standing questions.

tions and because Plaintiff fails to establish standing.

## II. FACTUAL BACKGROUND

Plaintiff brings these proceedings against IOR and OMF (collectively "Defendants") for conversion, unjust enrichment, restitution, an accounting and violations of customary international law based on Defendants' alleged possession, conversion and distribution of property stolen by the Ustasha Regime from people, including Plaintiff, during World War II; and Defendants' alleged assistance with the escape of war criminals. *See generally* Complaint.[4] He brings these claims on behalf of himself and all others similarly situated.

Plaintiff was born on April 29, 1936, and resided in Kostajnica, Yugoslavia as a child. *See* Complaint at ¶ 16. In 1941, Kostajnica came under the control of the Ustasha Regime ("Ustasha" or "Ustasha Regime"), the Croatian government operating as German National Socialist Government ("Nazi" or "Nazi Regime") protectorate from 1941 through 1945. *See id.* at ¶¶ 12–13, 16. OMF,[5] with the help of the Ustasha, forcibly proselytized the Roman Catholic faith on Plaintiff and his mother, both of whom were Serbian Orthodox. *See id.* at ¶ 16. Ultimately, Plaintiff and his mother were arrested due to their nationality and religious identity and, along with hundreds of thousands of other Serbs, Jews and Roma, transported to the Jasenovac concentration camps where prisoners endured forced labor and were liquidated. *See id.* at ¶¶ 16, 23–26. In 1942, Plaintiff and his mother were returned to their home. *See id.* at ¶ 16. The Ustasha then murdered Plaintiff's mother, orphaning Plaintiff when he was only six years old. *See id.*

Plaintiff further alleges he is the only heir to the wealth of his grandfather, Damjan Janus, a member of Serbia's educated elite and goods trader. *See* Complaint at ¶ 17. Janus was "a very wealthy man and resided in a large, two-story 'white marble' home." *Id.* Janus "was forced from his home and his belongings looted" before being burned alive by the Ustasha when Plaintiff was three years old. *Id.* at ¶ 17.

The Ustasha took any looted wealth ("Ustasha Treasury" or "Croatian Treasury") and collected it in central depositories for transfer to banks to fund Nazi war efforts. *See* Complaint at ¶ 18. Upon the demise of the Ustasha Regime in 1945, the Ustasha Treasury was transferred in the following alleged manner:

> [A]ll or a portion of the Ustasha Treasury was transferred to cooperative Ustasha Franciscans and/or other clergymen for transport to Rome where Franciscans sympathetic to the Ustasha were based. Intelligence reports confirm that in their attempts to escape, the Ustasha were found at the British-occupied Austro–Swiss border with gold valued at 350 million Swiss francs. Intelligence reports also confirm that more than 200 million Swiss francs were eventually transferred to Vatican City and the IOR with the assistance of the [OMF]. [Other] reports confirmed in 1948 that 2,400 kilos of Ustasha stolen gold were moved from the Vatican

**4.** The Court takes the factual allegations of the Complaint as true for the purposes of these motions. *See generally Thornhill Pub. v. Gen'l Tel. & Elec.,* 594 F.2d 730, 733 (9th Cir.1979) (finding that if a challenge to subject matter jurisdiction is facial, the factual allegations of the complaint are presumed to be true); *North Star Int'l v. Arizona Corp. Comm'n,* 720 F.2d 578, 580 (9th Cir.1983) (requiring courts to assume all factual allegations to be true on a motion to dismiss for failure to state a claim).

**5.** In the Complaint, Plaintiff attributes the above-described conduct to the "Franciscans," Complaint at ¶ 16. The Court presumes Plaintiff used the term "Franciscans" when referring to OMF.

to one of the Vatican's secret Swiss bank accounts.

*Id.* at ¶¶ 28–29. The IOR and OMF used the funds in the Ustasha Treasury to help Nazi war criminals escape with the operation of a "rat line" and to finance post-war activities of the Ustasha government in exile and Nazi fugitives. *See id.* at ¶ 30.

IOR transferred funds and made financial transactions. *See* Complaint at ¶ 31. "Not only were the IOR and [OMF] aware of the origins of the Ustasha Treasury, but covert Ustasha activities were officially tolerated by Defendants." *Id.* Further, IOR "reaped a competitive advantage in the post World War II years through the Ustasha Treasury related transactions ... and profited from Ustasha Treasury transactions involving banks in various European and South American countries. The [OMF] reaped similar monetary benefits from their involvement with the Ustasha Treasury." *Id.* at ¶ 32.

### III. ANALYSIS

Defendants now bring motions to dismiss the action on, among other things, the issues of whether the claims brought by Plaintiff are nonjusticiable political questions, and whether Plaintiff lacks standing. Together with the motions, both parties object to the submission of evidence by the other party. The Court addresses those objections first before continuing with a determination of the merits.

### A. Evidentiary Objections

#### 1. Defendants' Objections

█ Plaintiff, together with his opposition, files a request for judicial notice of various documents attached as exhibits to the Declaration of Barry G. Reed ("Reed Decl."). *See* Reed Decl. at ¶¶ 3–11, Exhs. A–F. Both IOR and OFM independently filed evidentiary objections to the request for judicial notice on grounds, primarily, that the documents attached are not adjudicative facts, as they must be for the Court to take judicial notice pursuant to Rule 201 of the Federal Rules of Evidence. IOR also filed a motion to strike portions of Plaintiff's opposition which rely on the facts established through and by the material for which Plaintiff seeks judicial notice. Plaintiff filed an opposition to either the objections or the motion to strike.

The Court may take judicial notice of facts which are either (1) generally known within the territorial jurisdiction of the trial court; or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. *See* Fed.R.Evid. 201(b). Plaintiff advises the documents were obtained using the Freedom of Information Act "from a variety of official archives regarding the issues in this case, including Vatican involvement in smuggling, protecting, financing and providing banking facilities for the Ustasha in the Post–World War II era." Reed Decl. at ¶ 3. Plaintiff relies on the documents for the truth of the matter asserted, and as support for the allegations he makes about the atrocities committed against him and his family, and Defendants' involvement therewith. These are documents which Plaintiff had not referenced specifically in his complaint.[6]

---

**6.** The only documents referenced in the Complaint are as follows: (1) at ¶ 4, June 2, 1998 Supplemental Report by the United States State Department U.S. and Allied Efforts To Recover and Restore Gold and Other Assets Stolen or Hidden by Germany During World War II, "The Fate of the Wartime Ustasha Treasury" coordinated by Stuart E. Eizenstat ("Eisenstat Report"); (2) at ¶ 20, June 23, 1941 Letter prepared by Ustasha leader Ante Pavelic to Hitler pledging Croatia's alliance to the Nazi Regime; (3) at ¶ 20, July 1, 1941, Hitler's response to Pavelic Letter; (4) at ¶¶ 28–29 October 21, 1946 Letter from U.S.

The documents are not appropriate for judicial notice, as they are neither generally known within the territorial jurisdiction of the trial court, or capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned, as they must be. As such, the Court DENIES Plaintiff's request for judicial notice,[7] and GRANTS IOR's motion to strike those portions of Plaintiff's opposition to the extent they require the Court to accept as true the statements made by and through the documents attached to the Reed Decl. as follows:

2:19–25 referring to the contents of CIA reports and intelligence sources from Britain, Germany, and Swiss Banks confirming that the "tentacles for the [IOR] reached deep into the Ustasha treasury and into the financing and planning of the 'rat line' escape routes for war criminals."

6:23–28 referring to the contention that the IOR "conducted commercial activity—receiving and transferring of funds—which a subsequent impact in the United States" and that the IOR was involved in financial wrongdoing resulting in the payment of damages.

7:9–12 referring to the contention that the IOR was "availing itself of commercial benefits of banking in the United States" and that the Federal Reserve Bank "had managed a gold custody account for the IOR" and reference to Exhibit A of the Reed Decl.

7:21–23 regarding the implication that the IOR engaged in the "management and movement of precious metals, currency and other assets."

28:29–29:1 regarding "the Vatican's involvement in the escape of illegal emigrants" and reference to Exhibit C of the Reed Decl.

The motion to strike, however, is DENIED to the extent the statements are aligned with and supported by the allegations in the Complaint.

**2. Plaintiff's Objections**

Plaintiff does not object to any specific evidence relied upon by Defendants in the form of declarations and exhibits thereto, but objects generally and seeks the Court's conversion of the motion to one for summary judgment. In connection with his request, Plaintiff seeks permission to conduct discovery on the limited issues raised in Defendants' motion. IOR counters that Plaintiff mischaracterizes its motion as one pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure when clearly IOR makes only a facial attack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure.

The Court is not persuaded that IOR's motion is one brought under Rule 12(b)(1)

---

Treasury Department agent, Emerson Bigelow, stationed in Italy to Harold Glasser, Director of Monetary Research ("Bigelow Letter"). Although referenced, Plaintiff attached none of the documents to the Complaint. At least the Eizenstat Report and the Bigelow Letter are attached as exhibits to the Declaration of Jeffrey S. Lena ("Lena Decl.") in support of IOR's motion. *See* Lena Decl., Exhs. E (*Eizenstat Report*) and G (*Bigelow Letter*).

**7.** Defendants also argue that the attachments are not properly authenticated and constitute multiple hearsay for which there are no exceptions. Although the Court does not rule on these objections raised, the Court believes there is merit to the objections raised by Defendants and expresses serious concerns about the admissibility of the documents attached to the Reed Decl.

of the Federal Rules of Civil Procedure. Moreover, it is unclear whether IOR's motion constitutes merely a facial attack in light of its significant reliance on declarations and exhibits. Clarification, however, is unnecessary in this case as the Court rules only on those prongs of the motions which do not require consideration of evidence outside the pleading.

## B. Political Question

■ In both their respective motions, IOR and OMF argue the claims brought by Plaintiff are nonjusticiable political questions. Plaintiff counters that the action does not raise political questions and merely seeks to have a commercial entity allegedly involved in the conversion of privately-owned stolen property provide an accounting to the owners of that property. *See* IOR Opp. at 19:24–28:17. Moreover, according to Plaintiff the case is a bank restitution case, as opposed to a reparations case, and no treaties between the United States and the Vatican exists to prohibit Plaintiff from bringing suit. *See id.*

■ The political question doctrine holds that a federal court having jurisdiction over a dispute should decline to adjudicate it on the ground that the case raises questions which should be addressed by the political branches of government. *See Baker v. Carr,* 369 U.S. 186, 210, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). The most appropriate case for applicability of the political question doctrine concerns the conduct of foreign affairs. *See id.* at 211. Courts should refrain from adjudicating questions of foreign policy because (1) the relevant materials in a case involving foreign policy will likely come from a multitude of sources, including U.S. and foreign sources, which might be voluminous and thus, potentially unmanageable for individual courts to handle; (2) there is a distinct possibility that the parties might not be able to compile all of the relevant information, thus making any attempt to justify a ruling on the merits of an issue that will affect the nation, difficult and imprudent; (3) courts cannot predict the international consequences flowing from a decision on the merits; (4) there might not be any standards for courts to apply in issuing a decision on the merits; and (5) courts addressing questions of foreign policy are faced with the task of reviewing initial determinations made by the political branches of government, determinations which are constitutionally committed to those branches. *See Chicago & S. Air Lines v. Waterman S.S. Corp.,* 333 U.S. 103, 111–13, 68 S.Ct. 431, 92 L.Ed. 568 (1948).

■ Of course, not every case involving foreign affairs or foreign relations raises a political question. *See Baker,* 369 U.S. at 211, 82 S.Ct. 691. In determining whether a matter raises political questions which the court must decline to address, the court must examine the following factors: (1) a demonstrable constitutional commitment of the issue to a coordinate political department; (2) the lack of judicially discoverable and manageable standards for resolving it; (3) the impossibility of making a decision without first making a policy determination of the type clearly outside judicial discretion; (4) the court's inability to resolve the issue without expressing lack of respect to the coordinate branches of government; (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potential for embarrassment from multifarious pronouncements by various departments on one question. *See id.* at 217, 82 S.Ct. 691. If any one of these factors "is inextricable from the case," the court should dismiss the case as nonjusticiable because it involves a political question. *See id.*

### 1. Demonstrable Constitutional Commitment

 The President is the "sole organ of the federal government in the field of international relations." *See United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 320, 57 S.Ct. 216, 81 L.Ed. 255 (1936); *see also Oetjen v. Central Leather Co.*, 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726 (1918) (finding that the Constitution relegates issues of foreign policy to the political departments of the government). As an issue affecting United States relations with the international community, war reparations fall within the domain of political branches and are not subject to judicial review. *See Oetjen*, 246 U.S. at 302, 38 S.Ct. 309.

Plaintiff's action seeks relief from, as it is alleged, OMF's and IOR's conversion and use of property plundered during World War II.[8] IOR argues that the claim is one for war reparations, and is nonjusticiable.

Plaintiff attempts to distinguish the instant action from actions for war reparations, arguing that he is not asserting claims for reparations but for bank restitution. *See* IOR Opp. at 22:16–28:17.[9] This distinction is one without a difference. Beginning with the Versailles Treaty concluding World War I, the term "reparations" has been deemed to refer to "all the loss and damage to which ... Governments and their nationals have been subjected as a consequence of the war imposed on them." *Burger–Fischer*

---

**8.** It is unclear from the allegations who looted Janns' property as the allegation stating the same is in the passive voice. *See* Complaint at ¶ 17 (stating Janns "was forced from his home and his belongings looted."). Moreover, it is difficult to infer that the Ustasha committed the atrocity. Specifically, according to the Complaint, the Ustasha Regime operated under German protectorate from 1941 to 1946. *See id.* at ¶ 13. Janns was burned alive when Plaintiff was three. *See id.* at ¶ 17. Having been born on April 29, 1936, Plaintiff was three between April 29, 1939 and April 28, 1940. By the allegations, the looting of Janus' property and his death occurred prior to the operation of the Ustasha Regime. The Court identifies these inconsistencies although they are immaterial to the determination of whether the action is nonjusticiable.

**9.** In support of his argument, Plaintiff also cites to three other cases: *In re Holocaust Victim Assets Litigation*, 105 F.Supp.2d 139 (E.D.N.Y.2000); *In re German and Austrian Bank Holocaust Litigation*, 80 F.Supp.2d 164 (S.D.N.Y.2000); and *In re Holocaust Era German Industry, Bank and Insurance Litigation*, No. MDL 1337, 2000 U.S. Dist. LEXIS 11650 (D.N.J. Aug. 4, 2000). These cases do not assist Plaintiff. Two of three cases were settled before the respective courts considered whether the actions were nonjusticiable. *See Holocaust Victim Assets*, 105 F.Supp.2d at

142 (stating the action was settled by the parties and the defendants agreed to create a fund in exchange for which they waived their defenses, among which was the political question defense); *German and Austrian Bank Holocaust*, 80 F.Supp.2d at 177 (stating the matter was settled prior to the court having determined whether the claims brought therein were nonjusticiable, one of many defenses the plaintiffs recognized posed a substantial risk of non-recovery). Moreover, the court in *Holocaust Victim Assets* espoused that the issue of justiciability was a "reality check for those objectors who believe that strong moral claims are easily converted into successful legal causes of action." *Holocaust Victims' Assets*, 105 F.Supp.2d at 148–49. Likewise, the court in *German and Austrian Bank Holocaust* stated that each of the defenses, including the political question defense, appeared to have merit. *See German and Austrian Bank Holocaust*, 80 F.Supp.2d at 177. The third case, *Holocaust Era German Industry*, also resulted in a dismissal on, among other things, nonjusticiability grounds. *See In re Nazi Era Cases Against German Defendants Litig.*, 129 F.Supp.2d 370 (D.N.J.2001) (dismissing on the basis of political question, cases which resulted from the consolidation of cases granted in *Holocaust Era German Industry* ).

*v. DeGussa AG,* 65 F.Supp.2d 248, 275 (D.N.J.1999) (citing Treaty of Peace between the Allied and Associated Powers and Germany, June 28, 1919, Art. 231, 1 Bevans 43, 137–38). Because here Plaintiff's claims stem from the conversion and use of property plundered during World War II, Plaintiff seeks to remedy a "loss and damage" he was subjected to as a consequence of the war. *Compare with Iwanowa v. Ford Motor Co.,* 67 F.Supp.2d 424, 485 n. 84 (D.N.J.1999) (rejecting the plaintiff's argument that she was not asserting claims for reparations but rather for restitution for forced labor on grounds that both the German Supreme Court and the German Federal Government had held that forced labor claims are reparations claims); *Burger–Fischer,* 65 F.Supp.2d at 272 (subsuming discussion pertaining to the conversion of gold stolen from forced laborers with discussion pertaining to reparations for the actual labor). Indeed, it is precisely this loss, namely the loss caused by the Ustasha, the State Department investigates, as evidenced by the Eizenstat Report. *See* Complaint at ¶ 4; *see also* Lena Decl., Exh. E (Eizenstat Report) at iv-vi, 141–56 (discussing Ustasha Treasury and Vatican involvement therewith). The action, therefore, however characterized by Plaintiff, raises nonjusticiable political questions and is one within the province of the political branches of our government.

Having said that, the Court recognizes that at least one district court in *Bodner v. Banque Paribas,* 114 F.Supp.2d 117 (E.D.N.Y.2000) continues to preside over a case claiming relief for conduct which occurred during World War II. Plaintiff relies on the holding in *Bodner,* to support his argument that courts have, in the past, overseen restitution cases and, as such, restitution cases are justiciable. *See* IOR Opp. at 26:2–27:16.

In *Bodner,* descendants of Jewish customers of French financial institutions sued the institutions, claiming damages arising from the institutions' alleged participation in a scheme to expropriate assets of customers during Nazi occupation. *See Bodner,* 114 F.Supp.2d at 121–22. The plaintiffs survived a dismissal motion on grounds of, among other things, international comity or the Act of State doctrine. *See id.* at 128–32. In denying the motion, the court found that the action was merely one among private parties which did not implicate or interfere with the conduct of a sovereign. *See id.*

In contrast to the instant action, the *Bodner* defendants never raised the political question defense. *See Bodner,* 114 F.Supp.2d at 129 n. 9 (in distinguishing *Burger–Fischer* and *Iwanowa,* stating "these cases were determined to raise nonjusticiable political questions, an issue not even raised by the defendants here and irrelevant to these facts in any event."). Moreover, *Bodner* involved a factually distinguishable claim, one which was not tied to the war atrocities of any given country, but instead involved the defendants' own conduct blocking access to accounts belonging to persons of Jewish ancestry before any official compulsion. *See Bodner,* 114 F.Supp.2d at 121–23. Therefore, that the *Bodner* action continues in a United States court does not persuade the Court to vary from its determination that the instant action presents a political question and is nonjusticiable.

**2. Judicially Discoverable and Manageable Standard**

Defendants argue no judicially manageable standards exist that this Court can employ to resolve Plaintiff's claim. Plaintiff counters that the "tort is conversion and the remedy is tracing and an accounting." IOR Opp. at 20:15–20.

The Court does not view the claims made in the Complaint lightly. It expresses its concern with, among other things, the evidentiary difficulties already evident in light of the time, place and manner in which the alleged conversion occurred, and the gravity and consequences of any decision the Court makes if it continues to preside over this action.[10] Other courts facing the same issue have expressed similar concerns. *See e.g. Burger–Fischer*, 65 F.Supp.2d at 284 (stating "[b]y what conceivable standard could a single court arrive at a fair allocation of resources among all the deserving groups? By what practical means could a single court acquire the information needed to fashion such a standard?"); *Iwanowa*, 67 F.Supp.2d at 489 (finding "[t]he specter of adjudicating thousands of claims arising out of a war that took place more than fifty years ago amounts to a more daunting task for this Court to tackle than the [court in *Kelberine v. Societe Internationale*, 363 F.2d 989 (D.C.Cir.1966) ][11] could have ever contemplated."). The Court, therefore, finds that it lacks judicially manageable standards to resolve the dispute raised herein.

Accordingly, and on this basis as well, the Court defers resolution of the claims raised here to the political branches of the government.

### 3. Respect to the Coordinate Branches of Government

As discussed above, the Constitution relegates issues of foreign policy to the political departments of the government. *See Curtiss–Wright*, 299 U.S. at 320, 57 S.Ct. 216; *see also Oetjen*, 246 U.S. at 302, 38 S.Ct. 309 (finding war reparations fall within the domain of political branches and are not subject to judicial review). In 1953, the executive branch declared that reparations and other governmental claims relating to World Wars I and II should more appropriately be dealt with in the context of a peace treaty or similar agreement. *See Burger–Fischer*, 65 F.Supp.2d at 256 (citing *Letter from Secretary of State John Foster Dulles to President Eisenhower*, 83rd Congress, 1st Sess. 205 (Apr. 4, 1953)).

Despite Plaintiff's attempt to characterize the case as being one for restitution,

---

**10.** Another action entitled *Alperin v. Vatican Bank*, No. 99–4941 MMC *("Alperin* Action") proceeds in this very district. That the *Alperin* Action proceeds before a different judge within this very district also concerns the Court as the plaintiffs in each respective action are seeking each of the two courts to allocate resources, if at all, from one source— the Ustasha Treasury.

**11.** In *Kelberine v. Societe Internationale*, 363 F.2d 989 (D.C.Cir.1966), the D.C. Circuit affirmed a dismissal of an action wherein the plaintiffs sought to enjoin the Attorney General of the United States and the Secretary of the Treasury from paying to a Swiss corporation its portion of the proceeds from a sale of stock allegedly transferred to some 200,000 persons for multifarious damages inflicted between 1933 and 1945 under the Nazi Conspiracy on grounds that the Swiss corporation profited from the conspiracy. *See Kelberine*, 363 F.2d at 991–92. The dismissal affirmed

was, in part, on nonjusticiability grounds because:

> As presently framed, the problem is not within the established scope of judicial authority. It did not arise under the Constitution or laws of the United States, or within the territorial jurisdiction of the courts of the United States. The premises for the conclusions are many and easily seen. The span between the doing of the damage and the application of the claimed assuagement is too vague. The time is too long. The identity of the alleged tortfeasors is too indefinite. The procedure sought—adjudication of some two hundred thousand claims for multifarious damages inflicted twenty to thirty years ago in a European area by a government then in power—is too complicated, too costly, to justify undertaking by a court without legislative provision of the means wherewith to proceed.

*Id.* at 995.

the Court finds it is one for war reparations. Treaties between countries concerning the return of property and compensation of World War II victims among, at least, Germany and other countries abound.[12] *See* OMF Motion to Dismiss ("OMF Mot.") at 7:23–28 (citing Agreement on reparations from Germany, on establishment of inter-allied reparation agency and on restitution of monetary gold, 61 Stat. 3157, TIAS 1655 (Jan. 14, 1946) (attached to the Lens Decl., Exh. C) and Paris Reparations Agreement, and Italian Treaty of Peace, 61 Stat. 1369 (Fed.10, 1947) (attached to the Lena Decl., Exh. D)); *see also Iwanowa,* 67 F.Supp.2d at 447–55 (citing to a number of treaties entered into for the purpose of compensating victims of the war), 486 n. 86 (citing to the treaties entered into by Germany, prior to its reunification, and various other countries to compensate victims of Nazi persecution).[13]

IOR further contends the Vatican City has been involved in recent international diplomatic efforts to address questions relating to Nazi-era looted assets, attending the London Conference on Nazi Gold in 1997 with representatives of forty-one other governments. *See* IOR Mot. at 18:24–28 (citing Lena Decl., Exh. F). It is further clear, from the Eizenstat Report relied upon by Plaintiff, that the United States State Department is investigating how to remedy those impacted by the Ustasha Regime, specifically targeting the Ustasha Treasury. *See* Complaint at ¶ 4; Lena Decl., Exh. E at iv-vi, 141–57.

Plaintiff does not dispute the existence of treaties, IOR's assertion that the claims herein are covered thereby, or Defendants' characterization that the treaty requires countries establish means by which war victims can seek reparations.[14] Nor does Plaintiff dispute IOR's contention that the Vatican has been involved in recent diplomatic efforts. The existence of treaties and negotiations involving the type of claim sought to be resolved here are the result of diplomatic efforts between nations, and constitute further evidence that the claims here are beyond the reach of this Court. As such, the Court finds the action presents a political question and is non-justiciable.

### 4. Policy Determination

The Complaint speaks of wartime plunder, accuses Defendants of knowing possession of looted property and assistance of war time criminals flee, and seeks to claim the involvement of banking institutions worldwide. It further requires the Court to determine whether IOR failed to respond to inquiry by the United States State Department regarding IOR's accounting, and whether the Vatican violated

---

**12.** Plaintiff does not object to IOR's reliance or characterization of the treaties.

**13.** OMF also argues that any claims Plaintiff may have against it are covered by the peace treaty entered into among Italy and several countries, including Yugoslavia. *See* OMF Motion at 8:4–11. Although the Court does not rely on the existence of the treaty to support its decision here, it finds OMF's argument compelling. Indeed, the Treaty of Peace with Italy, 61 Stat. 1369 (Feb. 10, 1947), was entered into in 1947 and, according to OMF, states that Italy will return all assets within its territory to individuals and

juridic persons. *See id.* (citing Declaration of Joanna D. Opperman, Exh. A (Treaty of Peace)). Moreover, the treaty dictates that governments, including the government in the country in which OFM is located, contract with governments of other countries to fashion remedies for World War II victims. *See id.; see also* IOR Mot. at 17 n. 15, 18:18–28 (citing Lena Decl., Exh. D). Plaintiff did not object to or provide opposition on this issue.

**14.** Plaintiff only states that no treaty exists between the Vatican and the United States. *See generally* IOR Opp. at 20:9–12. This fact is not disputed by the parties.

diplomatic norms. *See* Complaint at ¶¶ 13, 22, 30, 32–33, 75. Although Plaintiff insists the Court need not make policy determinations, at minimum the case would require the Court to sit in judgment of actions taken during World War II by, among others, the United States and Vatican City. Such determinations implicate international policy, intrusion into which the Constitution has left to the executive branch. *See Curtiss–Wright,* 299 U.S. at 320, 57 S.Ct. 216.

### 5. Need for Unquestioning Adherence / Political Embarrassment

The Court considers the remaining factors together. The political question doctrine is designed to avoid having "the judicial ... speak with multiple voices in an area where it is imperative that the nation speak as one." *Smith v. Reagan,* 844 F.2d 195, 198 (4th Cir.1988). As discussed above, Plaintiff seeks the Court's involvement in matters of foreign policy. He seeks the Court's judgment imposed on sovereigns for conduct committed during World War II. *See* Complaint at ¶¶ 13, 22, 30, 32–33, 75. As discussed above, this is precisely the type of case found to be non-justiciable by the majority of courts who have considered the issue. Accordingly, and as discussed above, the Court finds the action raises non-justiciable claims and GRANTS Defendants' motions.

### C. Standing

 IOR and OMF argue Plaintiff is unable to identify an injury that is particularized or traceable to Defendants. Plaintiff has the burden to demonstrate standing. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Class allegations are insufficient to establish standing and, instead, the named plaintiff must allege and show that they personally have been injured. *See Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

 To establish standing, Plaintiff must show, an injury in fact that is concrete and particularized. *See Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130. Further, Plaintiff must show that the injury is not conjectural or hypothetical. *See Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990). The injury must also be "fairly traceable" to Defendants' conduct, a requirement that demands Plaintiff show each link in the causal chain between the defendant and the asserted injury. *Allen v. Wright,* 468 U.S. 737, 759, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). Moreover, there must be some likelihood that the injury will be redressed by a favorable decision. *Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130. In determining standing, the Court must accept as true all material allegations of the complaint. *See Tyler v. Cuomo,* 236 F.3d 1124, 1131 (9th Cir.2000).

Plaintiff's standing in this matter against Defendants is tenuous at best. In his complaint, Plaintiff makes two allegations of wrongful conduct for which he seeks redress from Defendants. First, IOR possessed and profited from the looted and plundered assets of Plaintiff's grandfather. *See* Complaint at ¶¶ 17, 28, 30, 32. Specifically, he alleges, without identifying who, Janus was looted. *See id.* at ¶ 17 (stating Janus "was forced from his home and his belongings looted."). There are no allegations connecting the looted property of Janus to the Ustasha Treasury—only generalized allegations that the Ustasha Treasury was created as a result of property plundered. Moreover, allegations that the Ustasha did not form until 1941, and other allegations which seem to indicate that Janus was looted sometime in 1939 or 1940, render it impossible for the Court to find that the Ustasha looted the

property and then deposited it into the Ustasha Treasury. *See id.* at ¶¶ 16–17. Indeed, pursuant to the Complaint, there was no indication that the Ustasha Treasury existed at the time Janus was robbed of his property. In light of the allegations before it, the Court finds it difficult to determine that Plaintiff meets his burden.

Second, Defendants aided and abetted the Ustasha during the war, and post-war by assisting war criminals escape. *See id.* at ¶¶ 28, 30. Plaintiff fails to make allegations in the Complaint from which the Court could infer an injury in fact resulting from Defendants' conduct. As such, the Court finds Plaintiff fails to establish standing, and the Court GRANTS Defendants' motions on this ground.

## IV. CONCLUSION

Because the Court finds the issues raised in this action are nonjusticiable as political questions and because the Court finds Plaintiff has failed to establish standing, the Court GRANTS Defendants' motions and DISMISSES the action.[15] This Order does not speak to the remaining issues of immunity or comity.

**IT IS SO ORDERED.**

---

**15.** The remaining defendants are ARGENTINE, AUSTRIAN SWISS, SPANISH, ITALIAN, PORTUGUESE, VATICAN and GERMAN BANKING INSTITUTIONS as DOES 1–

10. The Court dismisses the action against the DOE Defendants as federal courts do not recognize them.